COURT OF APPEALS
DECISION
DATED AND FILED

April 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1633-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF5308

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

KENNETH SHELDON HILL,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: PEDRO A. COLÓN, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Kenneth Sheldon Hill appeals from a judgment of conviction for first-degree reckless injury and physical abuse of a child.  He also appeals from the order denying his postconviction motion without a hearing.  Hill argues that he was sentenced on inaccurate information concerning the severity of the victim's injuries.  He also argues that he received ineffective assistance of counsel because counsel failed to correct the misrepresentations of the victim's injuries during the trial and sentencing.  Upon review, we reject his arguments and affirm.

## BACKGROUND

¶2     Hill was charged with first-degree reckless injury and physical abuse of a child–intentional causation of bodily harm arising out of an incident on November 11, 2017.  According to the criminal complaint, Milwaukee Police Department (MPD) officers were dispatched for a battery complaint.  Sixteen-year-old Z.V. reported that when she went upstairs after hearing a noise, she saw Hill standing over her mother, W.V., and repeatedly punching W.V. in the head and face.  Hill grabbed Z.V. by the throat and pushed her against a wall when she threatened to call the police.  Z.V. ran downstairs to call the police.  Hill then went downstairs and ransacked the living room looking for his keys.  Hill then attacked Z.V. and threw her phone.  A responding officer reported noticeable scratches on Z.V.'s face.

¶3     The complaint continued that an officer found W.V. unresponsive on the floor upstairs and observed a significant amount of blood on the walls and mattress.  W.V. was transported to the hospital; she suffered a subdural hematoma, nasal bone fractures, neck pain, and received stitches for several facial lacerations.  When questioned, W.V. could not remember specific facts about the beating, but

she knew Hill, she knew he had been over the night before, and she identified him in a photograph lineup as her attacker.

¶4    The case proceeded to trial in April 2018.  The State called Z.V., W.V., two Milwaukee Police officers who responded to the 911 call, and an administrative assistant for the Milwaukee County District Attorney's Office witness protection unit.[1]  Hill testified in his own defense.  We recite the relevant trial testimony.  First, Z.V. testified, in accord with the criminal complaint, that Hill grabbed her by the throat and slammed her into a closet door when she threatened to call police when she saw him beating her mother on November 11, 2017.  The State played for the jury the 911 call that Z.V. made during the incident.

¶5    An MPD officer testified while video footage from his body camera was shown to the jury.  The officer testified that he saw blood and blood spatter on the walls, ceiling, floor, and on W.V., who was semi-conscious and not responsive to the officer's questions.  The officer then called for a medical unit to treat her.  The officer identified two photographs of W.V. that were taken while she was on an ambulance gurney; the photographs were admitted as exhibits and published to the jury.  W.V. was transported to St. Luke's Hospital, and was later transferred to Froedtert Hospital.

¶6    The officer testified that he met with W.V. at Froedtert Hospital two days after the incident.  He reviewed certified medical records regarding W.V.'s

---

[1] One MPD officer testified about Z.V.'s identification of Hill by photograph array.  The administrative assistant testified about transcribing a jail call that Hill made.  We do not discuss this testimony further.

injuries and treatment. The officer testified that according to the medical records, W.V. had the following injuries:

> Broken nose, different bones in the nose. Laceration, large laceration of the forehead, laceration to the nose. I believe three missing or three broken teeth and a missing tooth which you see in the photo actually sitting on her lip. A mid line shift of her brain within her skull which basically means it's moved off center and a subdural hematoma inside the skull which is a large blood clot essentially. Also an ankle injury, I believe, a fracture in the leg/ankle area of the leg.

The officer presented a summary of the reasons for W.V.'s hospitalization, which included: a traumatic brain injury (TBI); left convexity subdural hematoma; cerebral edema and brain compression upon admission; assault; left ear drainage consistent with cerebrospinal fluid (CSF); neck pain; fractures to the nasal and maxillary frontal process bones; lacerations on the bridge of the nose; and an ankle fracture. The date of discharge in the report was November 22, 2017, eleven days after the incident.

¶7    W.V. testified that on November 10, 2017, she hosted friends at her home—about six people, not including Hill—and Hill came and left three times over the evening. She woke up the next day at the hospital with no memory of what happened or how she was injured. W.V. testified that she was treated in the hospital for five days because CSF was leaking from her ear. She had a crack in her skull, a broken nose, a broken jaw, and she had to wear a neck brace for five weeks. She continues to suffer from memory issues, severe pain, and daily headaches.

¶8    Hill then took the stand in his defense. He testified that he was invited to W.V.'s house after drinking at a bar, she was having a party, and he drank even more at her house. He testified that W.V. and another person helped

him upstairs when he was completely drunk. He passed out drunk in an upstairs bedroom and woke up to people rummaging through his clothing, resulting in the theft of $1,550 in cash and a gold necklace. He testified that he began swinging in the dark room and did not know who he was hitting. He then realized he was hitting Z.V., stopped and apologized, and Z.V. told him that he better leave because she was calling 911. He testified that he did not intend to cause injuries to W.V. or Z.V. and he did not have total disregard for human life in his actions because no one died.[2]

¶9    The jury returned a guilty verdict on both counts. The circuit court sentenced Hill the same day. We discuss the court's sentencing decision in detail below. The court imposed a sentence of ten years of initial confinement and five years of extended supervision on the reckless injury offense, and eighteen months of initial confinement and eighteen months of extended supervision on the physical abuse of a child offense, to run consecutively.

¶10    Hill filed a WIS. STAT. RULE 809.30 (2021-22)[3] motion for postconviction relief requesting resentencing because his due process rights were violated when he was sentenced based on inaccurate information. Hill contended that W.V. was not unconscious or in a coma while treated at Froedtert Hospital; that W.V. did not lose any teeth in the assault; that W.V. did not have a broken ankle; that the records did not indicate that the fluid drainage from W.V.'s ear

---

[2] We note that Hill was charged with first-degree reckless injury, which requires the State to prove that the injury was made "under circumstances which showed utter disregard for human life."

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

resulted from the assault; and that while W.V. suffered serious injuries and considerable pain, she was not close to death. He also asserted that he was denied the effective assistance of counsel at sentencing for counsel's failure to object to the alleged inaccuracies.

¶11 The circuit court denied Hill's motion without a hearing in January 2022. The court concluded that Hill did not satisfy his burden to prove by clear and convincing evidence that the court relied upon inaccurate information at sentencing "merely by reviewing the medical records and rendering [trial counsel's] own opinion as to what the records do or do not support."[4] Moreover, the court concluded that the remarks to which Hill objected were not the basis of the court's sentencing. The court clarified that it misspoke when it characterized W.V. as unconscious for five days, as later remarks in the sentencing hearing show that the court understood W.V. was awake for the duration of her hospital stay. The court also noted that it made no mention of the victim's ankle injury, cracked skull, or broken or missing teeth and did not rely on this specific information either. The court concluded that even if trial counsel had sought to correct the record about particular facts about W.V.'s injuries, the court "would have imposed the exact same sentence that it did."

---

[4] In its postconviction decision, the circuit court found that Hill did not present expert opinion to dispute that W.V. was near death, that the ankle injury was pre-existing, or that the CSF fluid leak was unrelated and concluded that expert testimony would be necessary for Hill to meet his burden. Hill then received permission from this court for a supplemental postconviction motion, in which he presented a potential expert witness who could discuss W.V.'s injuries and inaccurate information about those injuries. The circuit court again denied Hill's supplemental postconviction motion, concluding that it stood by its previous decision and view that even if the alleged inaccuracies had been corrected, it would not have affected the court's sentencing.

¶12    This appeal follows.  Additional relevant facts will be discussed below.

## DISCUSSION

¶13    Hill asserts that there were five instances of inaccurate information that the circuit court considered that violated his constitutional right to due process:  (1) that W.V. was in a coma for five days, (2) that she lost three teeth in the assault, (3) that her ankle was broken in the assault, (4) that the CSF leak resulted from the assault, and (5) that the assault left her near death.  The State argues that W.V.'s medical records support all five issues; therefore, no inaccurate information was presented.

¶14    "A defendant has a constitutionally protected due process right to be sentenced upon accurate information."  *State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1.  Whether a defendant has been denied due process is a question of law that we review independently.  *Id.*

¶15    A defendant seeking resentencing "must show by clear and convincing evidence that:  (1) some information at the original sentencing was inaccurate, and (2) the circuit court actually relied on the inaccurate information at sentencing."  *State v. Coffee*, 2020 WI 1, ¶38, 389 Wis. 2d 627, 937 N.W.2d 579.  If "the defendant shows actual reliance on inaccurate information, the burden then shifts to the State to prove the error was harmless."  *State v. Travis*, 2013 WI 38, ¶23, 347 Wis. 2d 142, 832 N.W.2d 491.  "A reviewing court must independently review the record of the sentencing hearing to determine the existence of any

actual reliance on inaccurate information."[5]  *Id.*, ¶48.  "We review the circuit court's articulation of its basis for sentencing in the context of the entire sentencing transcript[.]"  *State v. Alexander*, 2015 WI 6, ¶25, 360 Wis. 2d 292, 858 N.W.2d 662.

¶16    We begin by turning to the record on the circuit court's sentencing remarks.  The circuit court stated that it considered the three required sentencing objectives:  "seriousness of the offense, [Hill's] character, and the need to … protect the public."  The court concluded that the seriousness of the offense was prescribed by the legislature's enactment of the offense as a D class felony, with a maximum possible penalty of twenty-five years in prison, noting that few offenses are "as serious as this one."

¶17    The circuit court discussed that when it heard the evidence, it was "taken aback by the gravity of the injury.  This was not being roughed up.  This wasn't being hit hard.  This was coming close to death.  Hit the way she was hit she came close to death."  The court further commented that "nobody sits unconscious for five days in the hospital unless they are severely severely injured.  This is the most dramatic beating I've ever seen anybody take out on someone else."

---

[5] Although the circuit court's postconviction decision affirmatively declares that these issues were not the basis of the court's decision, "[a] circuit court's after-the-fact assertion of non-reliance on allegedly inaccurate information is not dispositive of the issue of actual reliance." *State v. Travis*, 2013 WI 38, ¶48, 347 Wis. 2d 142, 832 N.W.2d 491.  For the record, the court stated that the reference to being unconscious for five days was a mistake and that the remainder of the court's decision showed the court understood W.V. was conscious; the court did not mention W.V.'s ankle or teeth in its sentencing remarks; that the CSF leak and treatment was established in the records; and that W.V.'s medical records showed she was in critical condition and relied upon a dictionary definition to show that critical condition was comparable to being near death.

¶18 The circuit court considered the medical records and relied upon medical practitioners for an objective assessment of the injuries, noting a CT scan and discharge summaries in the medical records. The court referenced that W.V. testified about her "memory loss." The court stated that it could not "begin to understand the pain that [W.V.] must've gone through for five days in the hospital," and that "[e]verything about this suggests that this person was in incredibly horrific pain." The court referenced W.V.'s testimony that she had a spinal drip and that"[s]pinal fluid [was] coming out of a human being's ear."

¶19 As far as considering Hill's character, the court addressed several concerns. The court stated that the evidence showed that Hill had known W.V. since they were children, and he visited because of their "long [non-romantic] relationship." The court stated it considered Hill's version of events because it allowed Hill to present a self defense theory. Hill described himself as "completely drunk" that night and that W.V. and a friend helped him upstairs. The court stated it was "completely and absolutely unbelievable" that Hill claimed he knew he was being robbed, but he did not "recognize the pain and the groan" of W.V., someone he had known for so many years. The court stated that even trying to give him the benefit of the doubt for being startled or afraid of being attacked, Hill's actions showed he did not stop, he just repeatedly beat W.V. and then turned on Z.V. when she arrived.

¶20 The court discussed Hill's attitude and anger, referencing the prosecutor's remarks about Hill's aggressive attitude and behavior with police before charges were filed. The court then compared that to Hill's behavior during the trial, when he did not want to appear at trial and he was angry. The record reflects that Hill refused to attend a half day of the trial. The court stated that it

understood Hill being unhappy with his actions and the systems; however, the court concluded that Hill lacked introspection.

¶21    The circuit court considered Hill's prior record in the context of his character, but noted that Hill was not being punished for previous offenses. The court was concerned that despite Hill having previously served a five-year prison term for reckless endangerment at the prime of his life, he had not grown out of petty conflicts.[6] The court concluded that imprisonment did not appear to have led to the insight or maturity Hill was supposed to have gotten.

¶22    The court directly addressed Hill, stating that he had to "respect human beings" and "to respect human life" despite how much he had to drink or how much money he lost. The court stressed that despite everything, "we still have to respect human beings" especially those we know, those that have cared for us, and those that have been in our lives for a long time.

¶23    We now turn to each of Hill's claims.[7] First, he argues that the court imposed a sentence based on the inaccurate information that W.V. was unconscious for five days. The record reflects that the court referred to W.V. as being unconscious for five days. The State argues this was merely a mistaken phrasing. Although within the court's discussion of the extent of W.V.'s injuries,

---

[6] We note that Hill was almost forty years old at the time of sentencing. The record reflects that the court considered Hill's prior record in recent years and when he was younger.

[7] For our analysis, we note that the postconviction briefing and decision showed a dispute about the meaning of parts of the 132-page certified medical records for W.V.'s hospitalization. This court does not conduct fact finding, nor do we have specialized medical knowledge that would render our review of the facts within the medical records to be a stronger analysis than that proposed by the State or Hill. However, Hill does not challenge the sufficiency of the evidence or directly challenge his conviction, and our inquiry focuses only on sentencing.

10

it incorrectly stated that "nobody sits unconscious for five days in the hospital unless they are severely severely injured," Hill fails to show that the court had an actual reliance on that inaccurate information. The sentencing remarks in full show that the court understood W.V. was conscious during her hospital stay. We conclude that this claim fails.

¶24    Second, Hill argues that the court sentenced him based on inaccurate information about injuries to W.V.'s teeth. At trial, an MPD officer reviewed W.V.'s medical records including information about dental injuries and broken teeth. Even if we assumed that inaccurate information about dental injuries was presented at the trial, we will not attempt to parse the factual basis for W.V.'s dental injuries or causation in discussing whether the information at sentencing was inaccurate. Instead, the record reflects that the State did not present information about W.V.'s teeth during its sentencing recommendation and the circuit court did not reference or rely upon information about W.V.'s dental injuries in its sentencing remarks. We conclude that Hill has failed to show that the circuit court had actual reliance on inaccurate information about W.V.'s dental injuries for sentencing purposes and this claim fails.

¶25    Third, Hill argues that information about injuries to W.V.'s ankle was inaccurate. Similar to the teeth claim, the factual basis of any ankle injury is not before us. While there was trial testimony about an ankle injury, neither the State nor the circuit court referenced W.V.'s ankle in the sentencing hearing. Even if we assume that inaccurate information was presented at trial, we conclude that Hill has failed to show that the circuit court had actual reliance on inaccurate information about W.V.'s ankle when it sentenced him. This claim fails.

¶26     Fourth, Hill argues that the circuit court relied on inaccurate information that the CSF leak was caused by the assault. Unlike the teeth or ankle injuries, the circuit court did consider the CSF leak and expressed concern that "[s]pinal fluid is coming out of a human being's ear." The court's remarks were in the context of the seriousness of the offense and the five days that W.V. spent in the hospital having spinal fluid drained. The trial testimony referenced W.V. having injuries including a TBI, facial lacerations, a broken nose, a broken jaw, and a misaligned skull. There was no testimony about how serious a CSF leak is, but there is ample support in the record that W.V. was treated for the CSF leak while hospitalized after the assault, and there were no objections or contrary testimony presented indicating that the treatment was coincidental. Hill did not object to the assault as the cause of injuries to W.V.'s head and it is disingenuous to attempt to differentiate or challenge the CSF leak and treatment for sentencing only. We conclude that Hill has failed to prove an actual reliance on inaccurate information about the CSF leak at sentencing. This claim fails.

¶27     Finally, Hill asserts that the court relied upon inaccurate information that W.V. was "near death." The court's sentencing comments showed that it considered this assault to have been extreme—it stated that W.V. had not been "roughed up" or "hit hard," but she was hit so hard "she came close to death." Although Hill argues that it was not accurate to consider W.V. near death, we understand the court's remarks to express how severe this beating appeared based on the evidence at trial, which included the body camera footage of the blood on the walls and floor where W.V. was found, the officer's testimony that W.V. was not responsive when police arrived, the medical records that detailed numerous, painful injuries, and W.V.'s testimony of memory loss. "Near death" was not a diagnosis in the medical records; rather, it was the circuit court's inference from

the facts presented and the court's opinion on how severe this assault was. Hill has failed to show this opinion was based on inaccurate information.

¶28 Moreover, the circuit court instructed the jury on the elements of first-degree reckless injury, for which the jury rendered a guilty verdict. One element was that Hill caused "[g]reat bodily harm" to W.V, which was defined as "injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily injury." Although Hill testified that he thought he "must have did [sic] something right because nobody died" and argued that someone would have to die for him to have "total disregard for human life," the jury's verdict shows it found he caused great bodily harm to W.V. As Hill has not challenged the sufficiency of the evidence for his conviction, Hill now makes a distinction without a difference to claim that W.V. was injured by this assault, but not "near death." In light of the entire record, we conclude that the circuit court did not actually rely on inaccurate information about the severity of W.V.'s injuries.

¶29 Our examination of the record shows that the circuit court was seriously disturbed by the violence of this beating and relied on the medical records to show that W.V. suffered extreme pain and several head injuries. The court's sentencing objectives reflected first the seriousness of the offense and the gravity of W.V.'s injuries. The court considered Hill's character, expressing concerns for Hill attacking a person he had known for decades; for hurting Z.V., who was by all accounts an innocent bystander even in Hill's defense theory; his lack of maturity and insight into his own behavior; his anger; and his lack of improvement despite a previous five-year prison term. The court was concerned about protecting society and wanted Hill to understand the importance of

13

respecting human life. The record reflects that the court considered the appropriate objectives and assigned the weight of each objective within its discretion. *State v. Ziegler*, 2006 WI App 49, ¶23, 289 Wis. 2d 594, 712 N.W.2d 76.

¶30 We conclude that Hill fails to satisfy his burden to show by clear and convincing evidence that inaccurate information was presented to the circuit court at sentencing and that the court relied upon this information. *Coffee*, 389 Wis. 2d 627, ¶38. Accordingly, Hill's constitutional right to due process was not violated. *Tiepelman*, 291 Wis. 2d 179, ¶9. He is not entitled to resentencing and his postconviction claim fails.

¶31 For similar reasons, we reject Hill's claim that trial counsel provided ineffective assistance for failing to object to inaccurate information at trial.[8] To succeed on his ineffectiveness claim, Hill's motion for postconviction relief must satisfy the familiar two-prong test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): deficient performance and prejudice to the defense from that performance. This court does not need to address both prongs if the defendant fails to make a showing on one of them. *Id.* at 697.

¶32 To make a showing of prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Therefore, for

---

[8] Hill offers the ineffective assistance of counsel claim to pre-emptively respond to the idea that Hill waived his inaccurate information at sentencing claim by not objecting contemporaneously. We do not interpret the State as arguing waiver, and we addressed the sentencing claim on the merits above.

Hill's claim to succeed, he would need to show that if counsel had objected to the allegedly inaccurate information, there would be a reasonable probability of a different outcome.

¶33 Here, the prejudice inquiry is intertwined with the inaccurate sentencing claim. *See Alexander*, 360 Wis. 2d 292, ¶¶38-39. As we concluded above, Hill's claims were either not based on inaccurate information or the circuit court did not rely on that information. We conclude that Hill has failed to make a showing of prejudice because he cannot show the resulting sentence would likely have been different. Without a showing of prejudice, we need not address whether trial counsel's performance was deficient and Hill's ineffectiveness claim fails. *Id.*, ¶40.

¶34 Finally, we conclude that the circuit court acted within its discretion to deny Hill's postconviction motion without a hearing. *See State v. Ruffin*, 2022 WI 34, ¶28, 401 Wis. 2d 619, 974 N.W.2d 432. The record conclusively demonstrates that Hill was not entitled to postconviction relief. *State v. Jackson*, 2023 WI 3, ¶8, 405 Wis. 2d 458, 983 N.W.2d 608.

## CONCLUSION

¶35 For the reasons stated above, we conclude that Hill's resentencing claim fails. We affirm the judgment and postconviction order.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.